Green, J.
(dissentiente.) Caroline P. Anderson being entitled to lot No. 89, in Nashville, worth from $10,000 to $15,000, in 1827 married T. P. Taul. On the 23d of July 1828, T. P. Taul and Caroline iiis wife, shortly after she had attained the age of twenty-one years, conveyed this lot to Benjamin Deckard, without consideration, who, the next day, 24th July, reconveyed the same lot to them. Mrs. Taul died the 30th of August thereafter. The original bill in this cause, filed in the lifetime of Thomas P. Taul, impeaches the title thus acquired by him, on the ground of fraud, and seeks to have the deed set aside.
Before we enter upon the discussion of the questions which arise in this cause, it will be useful to notice the proof, and to state the evidence of the most material witnesses. John Dougherty says, “I had a conversation with Thomas P. Taul, a few weeks after the deed referred to purports to be executed, and previous to the death of his wife, Caroline P. Taul. Mr. T. *566 p. Taul enquired of me, if I had heard a report about his obtaining a deed from his wife for some real proper ty in Nashville, and whether he was not much censured for the manner of obtaining it. 1 replied, that I had heard he had obtained such a deed, and he was generally much blamed for the time and manner of obtaining the same; and I added, it was said he deceived his wife and others in the manner of procuring said deed. To which Mr. Taul replied, that he had not deceived his wife, but that she executed said deed freely and voluntarily; and her reasons were, that she knew he had very little property of his own, and being in a had state of health, he was unable to procure his living by his profession, and that she wished him to have the benefit of her estate during his lifetime, and that at his death it should again revert hack to her heirs; that he had made a will at the time the deed was executed, to satisfy his wife that his promise to leave the property to her relations at his death, should he confirmed; and that will should never he revoked.” Doctor Matthew L. Dixon, examined hy the defendants, states, that he had a conversation with Mrs. Taul, after the deed was executed, in presence of her sister, Mrs. Campbell, and her husband, Thos. P. Taul, in which, among other things, she expressed a desire “that her husband, Thos. P. Taul, should he survive herself and babe, should have the benefit of her property during his lifetime, and that after his decease it should descend as above stated, if any thing were left; and that she wished none of it to descend to any of Mr. Taul’s relations.” This witness also states, “that T. P. Taul produced and read a will at the interview between Mrs. Taul and myself; he did not admit that the will was the cause of the deed being executed, nor did any conversation of that kind take place, hut he did admit that the deed and will were made at the same time, and that the will was designed to effect his wife’s wish *567 es in relation to the ultimate descent of the property.” Benjamin Deckard states, that he had a conversation with Mrs. Taul, a few days after the deed was made, at the request of her husband, when she expressed herself satisfied with the conveyance, observing, “for Mr. Taul had made a will, which placed her in no worse situation than she was before.” I enquired of her if she knew he could make another, and that the last would be binding; she replied, “that she knew a will could be revoked, but if she could not have confidence in her husband, she did not know who she could place it in.” I asked her if it was her wish, should Mr. Taul and herself die, that the property should pass into the hands of Mr. Taul’s own family? She said, “by no means; if they were both to die, she wished her relations to have it; but that Mr. Taul was in such ill health he could not make a living by his profession, and she felt it her duty to provide for him,” &c. “About this time, Mr. Taul came into the room where Mrs. Taul and myself were, and remarked that his wife and himself had frequently talked about doing what they had done in reference to the deed; and to assure me that he had done nothing but what was honest and fair, that he had made a will which he handed to Mrs. Taul, and then asked her for it; and when he got it he remarked, that I would perceive, that in making that will, they had reference only to themselves, and then read it, and observed, as it was his wife’s wish that the property should go to her relations, in the event of both their deaths, that if I would sit down, he would write a will in accordance to her wishes. He then wrote the will which I have exhibited as part of my answer in this cause, read it in the presence of Mrs. Taul and myself; and she then proposed that I should witness it; he replied no, that I should take it, and that he would call the next day at my store, take a copy of it, and that then it could be witnessed. He *568 never called, nor did lie ever saj any thing to me on the subject of the will.” The will above re-fcrred to, contains the following clause: “Item 2. In the event of my death happening after that of my wife, she leaving no issue, then it is my will, that Rufus K. Anderson and Musidora Campbell, should take and enjoy all the estate which I obtained by my wife, both real and personal, forever. If the same should be changed into money or other property, I will that an equivalent amount of my estate, should descend unto the said Rufus and Musidora, if such there should be.” This will was signed and dated the 29th July, 1828. A few days after the deed was executed, Peter S. Deckard, at the request of T. P. Taul, visited his wife, when in answer to his questions she said, “that she and Mr. Taul had mutually agreed, that if she died first, he, (Mr. Taul,) was to have the benefit of her property while he lived; that if he should die first, she was to have the benefit of the property; that in their present desperate situation, they would not need it long; that she did not believe that she would livelong; that Mr. Taul’s health was very bad; that he could not survive her a great while; that he would be unable to practise his profession, and that while he lived she wanted him to enjoy the benefit of her property. I think she further said that she and Mr. Taul had frequently conversed about the disposition of their property, and that Mr. Taul had made a will in accordance to her wishes.” The following letter addressed to James Campbell, is proved to be in the hand writing of Thomas P. Taul.
“19th September, 1828 : 7 miles from N.
Mr. Campbell: The more I reflect about matters, the more anxious I am to settle all things satisfactorily, and to leave nothing undone, which would save me future pain, or gratify those who are more anxious *569 I should do wrong, than that any good should come of what I do. You and Rufus ought to he with me as against Col. Anderson; it is a duty you owe to Caroline’s memory. She wished your wife and Rufus to have the property after my day. She did not wish Col. Anderson’s children to have the lot, or any part of it. There is no earthly chance for them; they may harrass me though, and cause me to spend one half this property to save the balance. I dont know that any such thing will he attempted; I only do not wish you and Rufus to take part, except with me, as against them» should any difficulty arise. I am willing now, if it will he of any service, to give up to your wife and Rufus a lot each, which would be about equal to their proportions, in case Caroline had made no deed, and give possession immediately. If you were in Nashville in six days, I would lay off the ground to you. My plan would be, to let you hare the two lots adjoining Porter’s, of 43⅜ feet each, which being more than your proportion, you and Rufus would have to pay me, between you, $>1000; or your ground could he had any where else. I make this proposal in the most entire confidence, that it will never be named to any human being, except Rufus and your wife, and to Rufus rather in the form of inquiry on your part, for I dont know— I wish you to have the property, what is left besides, precisely as Caroline desired. You would evidently get this property; and I should he pleased you and Rufus should have this much immediately, if we could understand each other. My object is, to keep you on the true side of your interest, and on that side which duty, feeling, and all demand of you, I think. Let no man see this, or know its contents — as—
T. P. Tatje.”
On the 24th of Septemper, five days after the date of this letter, Thomas P. Taul executed a power of *570 attorney to Thomas H. Fletcher and James Collins-worth, his agents and attorneys in fact, to dispose of and sell the lot (No. 89) in question. Thos. P. Taul wrote a letter to Thomas H. Fletcher, dated 31st July, 1829, in which he tells him “to sell the whole lot if he could, at any time thereafter;” and his instructions, left with Fletcher and Barrow, direct, that they sell at auction, on three days notice, 4-3⅜ feet adjoining Porter’s, for what it would bring. He told Matthew Barrow he was anxious to get $1000 advanced; that he wanted it to enable him to remove his father to Florida, without making sacrifices otherwise to raise the money.”
William Porter says, the lot was worth from twelve to fifteen thousand dollars.
Benjamin Deckard states, that before he consented to have his name used in these conveyances, T. P. Taul “came to me and observed, that his wife wished me to consent to have a deed made from them to me, and for me to reconvey again to them, in order to enable him to make a deed, should he sell the property, without being compelled to have his wife present.”
Dr. Dixon states, that Granville Lewis stated to him in presence of Taul, who confirmed Lewis’ statement, that he (Taul) had applied to Lewis, to suffer the Nashville lot to be conveyed to him, which Lewis declined, and that Taul requested him to say nothing about it.
Peter S. Deckard states, that on the evening before the final adjournment of the circuit court of Franklin county, at the July term, 1828, Thomas P. Taul and the Judge left the court house, and went in company to the house of James Campbell, (as witness understood from Taul,) “for the purpose of taking Mrs. Caroline P. Taul’s privy examination to a deed of conveyance Taul and wife had made to Porter for a lot, or part of one, in Nashville; that after being absent a short time, they returned together, and Mr. Taul handed me a deed to *571 Porter, with a certificate on the hack for me to sign, and also a deed of conveyance from the same, to Benjamin Deckard, for the remainder of said lot in Nashville, with a certificate on said deed for me to sign, as well as I recollect; that Taul acknowledged the same, and directed witness to place the same, together with the privy examination of his wife, on record, as taken by the court; that witness copied the same in his record book, signed the certificates on the deeds, and handed the same to Mr. Taul, who remained near the clerk’s table. It was then late in the evening, and court adjourned until the next morning at 5 or 6 o’clock. I am not positive whether the minutes of that day were read that evening, or the next morning; I however think not until the next morning; that when he, witness, had finished reading the minutes of that day, except the entries in relation to the deeds, and had commenced reading them, Mr. T¿ P. Taul, who was standing near me at the time, stopped witness, and remarked, that he did not care to have it read, that I need not trouble myself to do so; I replied to him, that it was my duty to do so, and that I must do it; and again commenced reading, when Mr. Taul again interrupted and stopped me, and called the attention of the court to the subject, and again remarked, that the clerk might omit reading it; that it was a private matter that concerned him and his family; that he did not wish to have it made public; that the court was fully in possession of the subject, and that it was unnecessary for the clerk to read it. The judge replied that he knew about it, and that I could pass it over, or something to that effect; that the minutes of the day were then signed, and two short entries were made, and the court adjourned until a special term of the court in December thereafter; and all before early breakfast on Thursday morning, the 24th July, 1828. The examination of Mrs. Taul was not had in the court house, but at the *572 house of Mr. J. Campbell. I am sure Mrs. Taul was' not in the court house during the whole term.”
John Handley, the deputy sheriff, and John Goodwin, a practising lawyer, state substantially the same facts in relation to the suppression of the reading the records. The certificates on the deed, and on the minutes of the court, state, that the deed was “in open court, signed, sealed and duly acknowledged by the said Thomas P. Taul and Caroline P. Taul, she, the said Caroline P. Taul, having first been privily examined by the court,” &c.
Dr. Dixon states, that “Thomas P. Taul said to me, that he had procured his wife’s signature to, and acknowledgment of the deed to Benjamin Deckard, without the knowledge of James Campbell or his family, and assigned as reasons for so doing, that his wife was then at Mr. Campbell’s house, and in such a bad state of health that it was impossible for her to be removed, and that he believed, that if Mr Campbell and his family had a knowledge of the transaction, they would be displeased, and that he preferred keeping peace with them on account of his wife’s situation.”
I have quoted thus fully from the depositions in this cause, because I intend to confine my discussion of it to the question of fraud; and because, in order to perceive. the force and practical application of the proof, it is important that we have a connected view of the facts as they occurred.
In considering this testimony, the question presents itself: Was Mrs. Taul deceived in this transaction? The whole testimony conclusively establishes, that it was Mrs, Taul’s wish and intention, that the property should go to her brother and sister, after her husband’s death. Whenever she spoke upon the subject, she expressed a wish that her relations should have it; whenever he talked about it, he acknowledged this was her desire. She said to B. and P.. S. Deckard, in his pre *573 sence, that such was her desire. So also, she told her father. His conversations with Dixon and Dougherty expressly admit that this was her wish. The fact he-ing indisputably established by the evidence of soma-ny concurring witnesses, that Mrs. Taul’s intention in this transaction, was to provide a support for her husband during his life, and after his death to bestow what might remain of her property on her brother and sister, we come next to enquire whether he promised to effectuate that intention.
Thomas P. Taul told Dixon in the presence of his wife, that the will and deed were made at the same time, and that the will was intended to effectuate his wife’s wishes in relation to the ultimate descent of the property. He told Dougherty, that his wife wished him to have the benefit of the estate for his life, and at his death that it should revert back to her brother and sister; that he made a will at the time the deed was executed, to satisfy his wife that his promise to leave the property to her relations at his death, should be confirmed. He stated in his letter to Campbell, that Caroline wished Mrs. Campbell and Rufus to have the lot after his day; that he was willing to give them part of it then, and that they would ultimately get the lot. This testimony indisputably proves, that T. P. Taul did promise to devise this property to Mrs. Campbell and Rufus K. Anderson, and that this promise was made at the time the deed was executed, and was, in part, the consideration moving Mrs, Taul to its execution.
We will next enquire, whether this promise took the confidence of Mrs. Taul, and created an. expectation with which her husband never intended to comply. That it took her confidence, which was placed in him to the most unbounded extent, no one can doubt. She told Benjamin Deckard, when conversing on the subject, that she could not lessen her husband so much as to place the property in the hands of another to leave *574 him an allowance; and that if she could not have confidence in him, in whom, she asked, could she place it? He told Dougherty, that he made a will at the time the deed was executed, to satisfy his wife that his promise should he confirmed. To Dixon he said, that the will was intended to effectuate his wife’s wishes in relation to the ultimate descent of the property. Proof more full, more clear, more convincing, that the promise to effect her wishes in relation to the ultimate descent of the property, was made by him to satisfy her, and that the will was made to inspire in her confidence that he would comply with it, and that by this means she was induced to make the deed, could not be desired.
But did he ever intend to comply, is the next enqui-ry. And here we must keep in mind, that Thomas P. Taul was a kuvyer of more than ordinary intelligence and attainments in his profession. The deed for the lot had been executed by them jointly, to Deckard, and a conveyance had been made to them. They both believed that this deed would vest in the survivor an absolute estate to the whole lot. The will which he had executed at the time the deed was made, had reference only to Taul and wife. It contained no devise, in any event, to Mrs. Campbell and Rufus K. Anderson. This was the will, which he said to Dougherty, he had made at the time of the execution of the deed, to satisfy his twife that this promise should be confirmed.— This was the will, which he said to Dixon, was intended to effect his wife’s wishes, in relation to the ultimate descent of the property. This was the will, which Mrs. Taul told Benjamin Deckard her husband had made, by which she was placed in no worse situation than she was before. Now compare these declarations with the fact. What promise did he tell Dougherty he had made his wife? A promise to leave the property to her relations at his death. To satisfy her that this *575 promise should be confirmed, he said he had made this will. But would this will confirm that promise? Surely not; for it contained no provision in favor of her reía-lations. If then she was satisfied that his promise would he confirmed by this will, was she not deceived? If he, being an intelligent and well informed lawyer, made this will to satisfy his wife, when he knew that it would not effect her wishes, nor confirm his promise, did he not most grossly impose upon her credulity, arising out of that confidence in him which he had inspired? And did he not, in that act of imposition, manifest most clearly that he did not intend to comply with his promise? Again: compare the fact with his declaration to Dixon. He said he had made a will to effect his wife’s wishes in relation to the ultimate descent of the property. Are we at any loss to ascertain what were her wishes in relation to the ultimate descent of the property? Surely not. ' About this, there' can be but one opinion. Both her declarations and his admissions establish the fact, that she wished it to go to her brother and sister. • But would this will effect her wishes, as he said to Dixon it was intended to do? We have seen that it would not. Again: at Taul’s request, B. Deckard conversed with her about the execution of the deed, and her wishes in relation to the disposition of the property. She said she was satisfied; for her husband had made a will that placed her in no worse situation than.she was before; thus showing that she considered, (the same thing which was indicated by Taul’s declarations to Dougherty and Dixon,) that this, will would accomplish all her purposes, and all her desires in relation to the property. How widely she was-mistaken, and how grossly deceived, we have already seen. If a party, in consideration of a benefit, undertakes to do a thing, and execute a writing inducing the belief in the other party that it will effect the understanding, when in fact he knows it will not, he thereby *576 evinces a want of intention to comply with his undertaking, and a disposition to impose upon and deceive the party with whom he is contracting; and so is guilty of fraud. So here, Thomas P. Taul, in consideration of the deed for the lot, undertook, that after his death, what might remain should go to Mrs. Campbell and Rufus K. Anderson; and he executed a will inducing the belief in his wife, that by it his undertaking would be effected, when in fact he knew it would not. Did he not thereby evince a want of intention to comply with his promise, and a disposition to impose on and deceive his wife?
In addition to these facts, there are other circumstances going to show that Thomas P. Taul did not intend to comply with the wish of his wife in relation to the ultimate disposition of her property. When in conversation with Benjamin Deckard, Mrs. Taul spoke of the will which Mr. Taul had made, as satisfying her wishes; he stepped in, and asked her for the will, and when he had obtained it, he said to Mr. Deckard, that he would see that in that will they had reference only to themselves, but as his wife wished the property to go to her brother and sister, he would write a will in accordance with her desire. He then wrote one, and signed it, devising the property in the event of his wife’s death without issue, and his own death, to Mrs. Campbell and Rufus K. Anderson. Mrs. Taul requested Mr. Deckard to witness this will, but Taul objected, saying that he would call at Mr. Deckard’s store the next day, and have it witnessed, which was never done. This was the 29th of July. Mrs. Taul died the last of August. On the 19th of September we find Taul writing to Campbell, from within seven miles of Nashville, telling him that Caroline wished Mrs. Campbell and Rufus to have the property after his day, that he was willing they should have part of it then, and that they would ultimately get the whole. Notwithstanding this, on the 24th of Sep *577 tember, only five days after the date of his letter to Camp-hell, Taul executed a power of attorney to Fletcher and Collinsworth to sell the’whole lot. We find in all this, a double dealing wholly inconsistent with fairness of purpose. In the first place, his wife was under the impression, that the first will,made at the lime of executing the deed, would effect her wishes. Taul told Dougherty and Dixon that this will was intended to have that effect, and was made to satisfy his wife that his promise should be confirmed. But when Mr. Deckard was conversing with her, and the subject of the will was mentioned, he admitted it had reference only to themselves, and sat down and wrote and signed another, in accordance, as he said, with her wishes. When she, anxious to effect her purpose, requested Deckard to witness this will, he adroitly evaded it, by saying he would call the next day and take a copy, and have it witnessed. This he did not do; and his wife remained to the day of her death, so far as we know, or have reason to believe, under the impression that this will had been duly and solemnly executed and witnessed, and in the fullest assurance that he would never revoke it.— After the death of his wife, we perceive the same deceptions course in relation to those who were the secondary objects of her bounty. His letter to Campbell was evidently intended, and was calculated to inspire a confidence that Caroline’s wishes would be complied with, and to prevent the execution of any means to set aside the conveyance he had obtained. He appeals to his interests; he would now, he said, if it would be of any service, give him a lot, worth more, than as an heir of Mrs. Taul, Mrs. Campbell would be entitled to; add to which, eventually Mrs. Campbell and Rufus would get the whole. He appeals to his respect for the memory of Caroline. She wished, said he, that Mrs. Campbell and Rufus should have it. She did not wish Col. Anderson’s other children to get any part; it was there *578 fore, he said, a duty Campbell owed to the memory of Caroline, to take part with him. Notwithstanding this letter containing all these professions, the power of attorney to Fletcher and Collinsworth, to sell the whole lot, was executed only five days afterwards. The sale of the whole of this lot was unnecessary, in order to raise means for his support. It was a large unimproved lot, and could properly and advantageously be disposed of in parcels.' His own plan of disposition, as furnished his agents, was to sell it in several different parcels; but his power of attorney authorized a disposition of the whole, although he had previously received by his wife several thousand dollars of other property. Thus showing, at the very time he was professing so much respect for the wishes of his deceased wife, and so determined a purpose to fulfill them, an intention never to comply with her desire, or his promise. His subsequent conduct too, is evidence of what his intentions were at the time he made the promise to his wife, and obtained the deed.— In June 1829, he requested Gibbs to sell this lot, and in the month of July thereafter, the lot not having been sold previously, he united Matthew Barrow with his other agents, directing them in writing to sell the whole lot at private hand if they could, and if not, to sell part of it at auction on three days notice, for what it would bring. He told Mr. Barrow that he wanted a thousand dollars in hand, for the purpose of moving his father to Florida. A sale under these directions was prevented by the filing of this bill. We see here a most striking display of the same purpose to violate the wishes of his wife, and his promise to her. She wished him to have the property for his support during his life, and then to go to her brother and sister. He promised, as he told Dougherty, that these wishes should be effected; and thus he obtained the deed. But instead of manifesting a disposition to comply with this promise, by selling parcels only of the lot as his necessities might require to be *579 applied to his support, he orders the whole to he sold, and declares to Barrow that he wanted the money for a purpose wholly foreign from the use for which his wife had bestowed it upon him.
There is another view of this transaction, in relation to the manner in which the title to the lot was obtained, which now demands to be noticed. And here, the whole progress of the transaction is so marked with falsehood, deception and secrecy, as to furnish, of itself, such evidence of fraud as to set it aside. When Taul came to B. Deckard to procure his agency in the matter, he stated that his wife wished to have the conveyance made to Mr. Deckard, and a reconveyance back from him to them, in order to enable Taul to make a deed, should he sell, without the necessity of having his wife present." This was a misrepresentation of the intention and design of the parties. In the first place, he was too good a lawyer not to know that his wife’s presence would he as necessary after this change in the character of the title, as it was before. But the purpose after-wards avowed was wholly different from that stated by him. He had applied to Granville Lewis before he did to Deckard, to be the medium through whom the conveyance might he made to him. When Lewis declined, he enjoined on him to keep the matter secret. Although Taul and wife were sojourning, during her illness, at the house of Mr. Campbell, yet so secretly was the whole transaction conducted, that Mrs. Taul’s relations were kept wholly ignorant that any such matter was in agitation until after it was consummated. As the deed from Taul and wife to Porter was to be executed and acknowledged, this occasion was artfully seized to procure the execution of the other, by which to vest the title in himself. The taking the acknowledgment and privy examination of Mrs. Taul, to the Porter deed, was postponed until the evening of the last day of court, when the Judge, in company with Taul only, *580 went to her sick chamber at the house of Campbell, where she was confined, and took her acknowledgment to both deeds. They were then delivered by the Judge to Taul, who caused the deputy clerk to copy on the minutes of the court the judge’s certificates. The business of the court being through, and the judge desirous to get away early next day, the court was adjourned to meet at 5 o’clock the next morning. When the court did meet, and the minutes of the preceding day were being read, Taul suggested to the deputy clerk, not to read the entries in relation to these deeds; but when the clerk told. him it was his duty, and he must read them, he requested the judge to have them passed over without being read, as it was a family matter which he did not wish made public; to which the judge assented, directing the clerk not to read it; and these entries, showing the acknowledgment and privy examination of Mrs. Taul, were notread. The minutes were signed, and the court adjourned at a very early hour. Doctor Dixon states, that Taul acknowledged to him, that he had procured the signature of his wife, and her acknowledgment to the deed, without the knowledge of Campbell and family; that his reason for doing so was, because she was at the house of Campbell, and he expected Campbell and wife would be displeased; and as his wife was not in a situation to be removed, he preferred keeping peace, I cannot upon this part of the case express my views of it better than in the language of the chancellor. He says, “it was very natural some provision should have been made for the husband out of the property of the wife. But what provision, ought to have been a matter of grave consideration, and reflection and advice; not between themselves only, but with their friends and relations respectively. She ought to haye been permitted, nay urged by T, P. Taul, to consult her friends. If they had been unreasonable, the independence and decision of character on her part, which has been so much *581 spoken of, would have shown itself. He did not so urge her. He studiously concealed their purpose. It will not do to say her family and connections were not her guardians. True, they were not technically so. But Jie, if his purposes were fair, ought to have given her the benefit of their advice. He did not. He was careful not to do it. He told Granville Lewis, to whom he applied to receive a deed from them, and who refused, that he must not name that application to any body. He had his deeds previously prepared. He deferred the matter to a late period of the court. He availed himself dextrously of the necessity of the probate and examination of the deed to Porter. He went to the house of Campbell with the judge, under color, so far as Campbell knew, of the Porter deed. He procured the judge, for the avowed purpose of concealment, to suppress the reading of the entry in the record book relating to the deed. What was the object of this cautious and anxious concealment? It could not have been that assigned by himself, that he and his wife were at Campbell’s house, and that he, Taul, would feel unpleasant if it were known. His good sense would assure him that it must be known, and that shortly, to Campbell. The clerk knew it, Deckard to whom the deed was made knew it, and the attesting witnesses to one of the deeds knew it. And accordingly on the next day, it was, as Taul must-have foreseen, known to Campbell and persons generally. This artful, anxious and persevering secrecy, has ever been deservedly regarded by the courts, in such transactions, as a very important and suspicious circumstance.” As no reason, which can for a moment be admitted, even by the most credulous, to have been the true one, consistent with fairness of purpose, has ever been given by Thomas P. Taul, why this transaction was conducted with so much secrecy and artful management, we are forced to the conclusion that his motive was not of a proper and justifiable character. — ? *582 When we take a review of the whole transaction, we are at no loss to perceive the motive. I have shown that Mrs. Taul was deceived as to the effect of the will which had been executed at the time she signed the deed to Deckard. She supposed it would effect her wishes in relation to the ultimate disposition of the property. So in effect, she told Mr. Deckard; so in terms Taul told Dixon and Dougherty. The only motive, therefore, which can he reasonably assigned, why he desired the transaction to he kept secret, must have been an apprehension that by conversations with her friends she might be undeceived, and change her mode of providing for his support, consistent with the interests of her brother and sister, for whom she also wished to provide.
The counsel for the defendants place much reliance upon the fact, that Mrs. Taul possessed a mind of more than ordinary intelligence and cultivation; and therefore it is argued, she could not be deceived about this matter. The first answer to this argument is, that although she was intelligent and well informed, she was no lawyer. Her health too, had long been declining, and at the time of the execution of the deed, she was very low and feeble, not expecting to recover. Can it be thought strange, under these circumstances, that she should have relied implicitly upon her husband, for whose talents and integrity she entertained the most exalted opinion? and are we to reject the most direct and conclusive proof, merely upon the supposition, that because she was intelligent, she was therefore incapable of being imposed upon by a husband she loved, and in whom she confided? But it is insisted, that she felt no concern about the will; that her primary object was to provide for her husband, and that she merely expressed a desire that whatever might be left of her property after his death, should go to her relations, leaving it perfectly discretionary with him whether to give it that direction or not. The whole of this argument is met di *583 rectly, and answered conclusively, by the proof. That she was solicitous about the will, is manifest from the fact, that when herself and Deckard were talking about it, and Mr. Taul stepped in, he asked her for the will, for she had kept possession of it, as being of consequence to heV. When Taul wrote and signed the other, she requested Deckard to witness it, evincing thereby her interest about it. The truth must strike every man with force, who reads this record, that she valued the will greatly, as in her opinion securing an object of great solicitude to her. Nor does the evidence countenance the conclusion, that she merely .expressed a preference as to the disposition Mr. Taul might make of the property at his death. On the contrary, it was a subject of positive contract between them. He said he had executed a will at the time to confirm his promise that it should be complied with. Whenever she conversed on the subject, whenever he spoke about it, and when he wrote to Campbell, we have the same exhibition of her solicitude, that, next to her husband, she wished her brother and sister to be provided for. And surely it was reasonable that she should look beyond a provision for him. For, in answer to Taul’s question, in the presence of P. S. Deckard, she said, “that in their present desperate situation they would not need it long; that she did not believe that she would live long; that Mr. Taul’s health was very bad, and that he could not survive her a great while.” Anticipating, therefore, a speedy termination of her own existence, as she constantly did, and that her husband could not long survive her; being the ovfoier of considerable property; about to leave an only brother and sister of the whole blood; in the house of the latter, of whom she had been an inmate for three years preceding her marriage; to whom she was most affectionately attached; and in whose house she was then confined by sickness, and by whom she was tenderly nursed day and night; under these circumstances, if *584 she had forgotten tlxis sister, her memory would not have deserved the eulogies so handsomely and so deservedly bestowed by defendants’ counsel on her head and her heart. But she did not forget her. Nor did she leave the matter to the mere discretion of another; she made it a matter of contract, of positive stipulation.
But it is argued, that there could not have been fraud in procuring this deed, because Taul might have sold the property long before; that she had advised him, in her letter of April 19th, 1827, to do so, and that she would have joined in a conveyance. It is true she had advised a sale; but this was long before, when her circumstances were wholly different; when she had no anticipation of approaching death; when she was looking forward to his future success and distinction in his profession; and consequently, when she had no motive to look beyond the personal interests of herself and husband. But now she was on her death-bed; her husband in a deep decline, so as to force him to abandon his profession; he could not, as she said, survive her long. What then was to become of the property after his death? Either, it must go to his relations, the present defendants, or to her relations, the complainants. Did she desire it to go to the former? No one has ever suggested that she did; while on the contrary, all the testimony shows her wish that it should go to the latter.— Here then was a powerful reason operating on her which did not exist at the time she advised the sale. To defeat this wish of his wife, all his art, deception and secrecy, were directed. But it is contended at the bar, that she knew the deeds would vest the property in him, and that the will could be revoked, and yet she was entirely satisfied with the arrangement, and would not alter it, and therefore the idea of fraud is repelled.
It is true that when she conversed with Mr. Deckard, she knew a will could be revoked; but she said, “if she could not have confidence in her husband, she did not *585 know who she could place it in.” She said he had made a will by which she was placed in no worse situation than she was before. This will “satisfied” lier, that his “promise” to effect her wishes in relation to the ultimate descent of the property, would he confirmed, and that it never would he revoked. What proof of fairness is it, for one party to know what she is doing, and to he satisfied with the transaction, when that satisfaction is produced by the deceitful and false representations of the other? Surely none.
In reviewing this transaction, we are met at every step by the most striking evidences of fraud, without, in my view of the case, a single repellant fact. We see T. P. Taul, in the first instance, making a promise when he obtained the deed, that his wife’s relations should inherit the property after his death. We see him executing a will, to confirm his wife in the belief that he would execute that promise, which will would have had no such effect, and consequently was deceptive and illusory. We see him, when another is written and signed, making the provision she desired, evading having it witnessed, although she desired it, and promising to have it witnessed next day, which he failed to do, and by which she was deceived, and so continued. We see him practising the most artful and secret management, in procuring the execution and acknowledgment of the deed from his wife; thus dealing with a young, confiding, ardently attached, and sick wife, for her valuable separate property, without the knowledge of her relations and friends; without advice from any source but himself; without knowledge of the legal effect of the instruments executed, except such as she derived from him; and thus circumstanced, deceiving her, and defeating every purpose she had in view, except that in relation to himself. He interposed and prevailed on the Judge to suppress the reading of the record in relation to the deed, that the secrecy with which. *586 the whole matter had been conducted, might be preserved until after the adjournment of court. He writes to Campbell, professing the greatest respect for his wife’s wishes, and a determination to fulfil them; and yet, in five days afterwards, he authorizes a sale of the whole lot, the more effectually to defeat her wishes in relation to her brother and sister. And last, as a demonstration of the purpose which had uniformly actuated him, he directs the whole lot to be sold, part of it at three days notice, for what it would bring, declaring he wan Led $¡1000 for the purpose of moving his father to Florida, thereby evincing that he did not intend there should be any remainder after his death. When we consider the relations and character of the parties dealing; that the one was a husband, learned in the law, and the oilier a young, confiding and ardently devoted wife, but lately arrived at lawful age, in delicate and dangerous health, feeble, and confined to her room at the house of her sister, and at the time of the execution of the deeds, rapidly approaching a dangerous crisis in her fate; for she was far advanced in pregnancy; when we consider that the conveyance and reconveyance, in substance, and in fact, amounted to a gift from the wife to the husband of her real estate, -worth, according to varying estimates, from six to fifteen thousand dollars; it is calculated, as is well remarked by the chancellor, ‘'"according to legal principle, justly to arouse judicial ’ suspicion. The marital power and influence are so peculiar, the opportunities growing out of this domestic relation, of exerting a secret and pernicious guidance over the mind and will of the wife, are so various and so multiplied, that the femey and her rights and property, have ever been guarded by the courts against them, with a jealous vigilance. In such cases, evidence of imposition and fraud, much less conclusive than would be required in ordinary cases, would he sufficient to set aside convey- *587 anees from the wife to the husband. True, the wife may give her property to her husband; hut it must, as Lord Hardwicke said in Grigby vs. Cox, (1 Ves. 517) he “fairly procured, without improper influence.”—Chief Justice Spencer says, in the case of Jaques vs. the M. E. Church, (17 John. Rep. 580,) that “the disposition of the wife must he free, neither the result of flattery or force.” Mr. Clancy, (p 166) says, “that a married woman may give her separate estate to her husband, and the gift will he established, if no unfair advantage he taken of her in the transaction.” The common law (1 Inst. Lib. 2, note 171,) is jealous of the great authority of the husband over the wife, and fearful of the using improper influences over her. The husband, as Chancellor Kent justly remarks, (2 Kent’s Com. 139,) has the means of exerting over the wife “a secret and insensible influence, which might he exerted unduly, and yet in a manner to baffle all inquiry and detection.” How important is it then, that the jealousy, the judicial suspicion of the court should he aroused, when a contract, such as the one before us, is the subject of investigation. The husband, or those claiming under him, should show clearly that the transaction was fair, in order to induce the court to support it. But instead of this, the cause presents, in my view, such evidences of fraud, as to furnish ample ground for setting aside the deeds, even if the dealing had been between strangers. I therefore, fully concur in this part of the case with the chancellor, and thinking it unnecessary to discuss the other questions, I am of opinion the decree ought to be affirmed.
Decree reversed.